**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA.   CRIMINAL NO. 08-10071-RGS
                            .
  V.                        .   BOSTON, MASSACHUSETTS
                            .   APRIL 29, 2008
BRIMA WURIE                 .
  Defendant                 .
. . . . . . . . . . . . .

         TRANSCRIPT OF DETENTION HEARING
     BEFORE THE HONORABLE JUDITH G. DEIN
          UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the government:     Gretchen A. Lundgren, Esquire
                        Suffolk County DA's Office
                        1 Bullfinch Place
                        Boston, MA 02214
                        617-619-4000
                        Gretchen.Lundgren@usdoj.gov


For the defendant:      John Benzan, Esquire
                        Law Offices of John Benzan
                        Suite 8
                        70 Warren Street
                        Roxbury, MA 02119
                        617-442-8400
                        johnbenzan@msn.com


  Court Reporter:


  Proceedings recorded by electronic sound recording,
  transcript produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
Wrentham, MA  02093
(508) 384-2003

2

1                       **I N D E X**

2   **WITNESSES**          **DIRECT**   **CROSS**   **REDIRECT**       **RECROSS**

3   **Government's:**

4   Paul Murphy, Jr.    5        36

5   **EXHIBITS:**        **DESCRIPTION**                    **IN EVIDENCE**

6   **Government's:**

7      1              Police Report                    15

8      2              Police Report re:  Search        27

9      3              Search Warrant                   29

10     4              Analysis Certificates            30

11     5              Series of Convictions            33

12     6              Boston Police Department Report

13                        Dated 7/17/07                36

14

15

16

17

18

19

20

21

22

23

24

25

3

1    <u>P R O C E E D I N G S</u>

2        CASE CALLED INTO SESSION

3            THE CLERK:  On April 29, the year 2008, in the matter

4    of the United States of America v. Brima Wurie, Criminal Case

5    No. 2008-10071.  Will counsel please identify themselves for

6    the record.

7            MS. LUNDGREN:  Good afternoon, Your Honor, Gretchen

8    Lundgren for the United States.

9            MR. BENZAN:  Good afternoon, Your Honor, John Benzan,

10   for Brima Wurie.

11           THE COURT:  Okay.  We're here on the issue of

12   detention.

13           MS. LUNDGREN:  That's correct, Your Honor, the

14   government is ready to proceed.

15           THE COURT:  Okay.  Is defendant ready as well?

16           MR. BENZAN:  Yes, Your Honor, yes, we're ready.

17           THE COURT:  Will you call your first witness, please?

18           MS. LUNDGREN:  Your Honor, the government calls

19   Sergeant Detective Paul Murphy.

20       GOVERNMENT WITNESS, PAUL MURPHY, SWORN

21           THE CLERK:  Please state your full name, spelling

22   your last name for the record.

23           THE WITNESS:  Good afternoon, Your Honor.  My name is

24   Paul Murphy, Jr., last name is spelled M-U-R-P-H-Y.

25           MS. LUNDGREN:  And if Your Honor would like, I have

4

1  pre-marked some exhibits which I expect will be accepted by

2  the Court.  I have a courtesy copy for if you'd like to follow

3  along as we introduce them.  I've given the same copy to

4  defense counsel.

5          THE COURT:  Thank you.

6                  DIRECT EXAMINATION

7  BY MS. LUNDGREN:

8  Q    Good afternoon, sir.

9  A    Good afternoon.

10 Q    Sergeant Detective Murphy, could you tell us how you are

11 employed?

12 A    I'm a sergeant detective with the Boston Police

13 Department.

14 Q    And how long have you been with the Boston Police

15 Department?

16 A    23 years.

17 Q    And in particular, how long have you focused on drug

18 investigations?

19 A    Off and on probably 13 years, I suppose.

20 Q    When did you join the drug control unit?

21 A    Initially I believe about 1991, 1992, I was there for two

22 years, nights, when it was city-wide, the whole thing was city-

23 wide.  And they broke it up into different divisions and I went

24 to Mattapan for two years nights, I made sergeant and from

25 there I went to the gang unit and then I went back to the drug

1  unit in 2000 and I've been there since as a sergeant

2  detective.

3  Q    Okay.  Sergeant Detective Murphy, I'd like to ask you some

4  basic questions about your experiences.  Are you familiar with

5  what's called a motor vehicle drug delivery?

6  A    Yes.

7  Q    And could you please explain what that is?

8  A.   It's still one of the more popular methods by which the

9  drugs are sold in different sections of the city.  A buyer will

10 contact a dealer via cell phone and the amount of drugs and the

11 location of the purchase or the meeting spot rather will be

12 arranged, and the buyer will either await the dealer's arrival

13 on foot or in a motor vehicle.  In a case like this if a buyer

14 is waiting on foot, generally the buyer will enter the car of

15 the dealer and take what we commonly term a meaningless ride,

16 like a ride up the street and back or a ride around the block

17 or maybe a ride from one MBTA station to another when they

18 could have taken the bus or the train, something that doesn't

19 make sense, and the deal is done within the car and the two

20 part ways and go and leave.

21 Q.   Okay.  And what's your understanding as to why the deal

22 takes place in the car as opposed to anywhere else?

23 A.   To avoid surveillance.  It's moving and obviously you

24 can't see their hands or body in the car while they're passing

25 money and narcotics.

6

1  Q.   And, sergeant, in your line of work have you personally

2  had experience with a motor vehicle drug delivery?

3  A.   Yes.

4  Q.   Can you please explain that?

5  A.   I've done it myself.  I've gotten into cars and bought

6  drugs from people that they obviously didn't know that I was

7  the police, but I have lots of informants that I pay money to

8  and nightly I have all these dealers.  I've got to watch them

9  get into a car with a dealer and take a ride and come back, and

10 they give me the drugs, and then we'll get the license plate of

11 the dealer.  We'll follow him home.  Or in an instance like

12 this, I mean, I don't know, easy over 1,000 arrests of people

13 buying drugs by means of a motor vehicle.  So it's something

14 I've seen a lot.

15 Q.   Okay.  And also, Sergeant Detective Murphy, given your

16 training experience, have you made arrests, and are you

17 familiar with marijuana?

18 A.   Yes.

19 Q.   And are you familiar with the smell of marijuana?

20 A.   Yes.

21 Q.   And can you please explain the experience you've had with

22 the smell of marijuana?

23 A.   Well, it's a distinctive odor characteristic only of that

24 substance.  I don't think it can even be mistaken for anything

25 else.  It's almost, I always say when I ask the question, it's

1  almost like what does milk taste like?  It tastes like milk,

2  nothing else.  It's like what does marijuana taste like, smell

3  like it?  It smells like marijuana.

4  Q.   Okay.  So is it fair to say then you've had experience

5  during drug investigations to experience the smell for

6  marijuana?

7  A.   Yes.

8  Q.   Okay.  Sergeant Detective Murphy, I'd like to turn your

9  attention to September 5th of 2007; were you working that

10 evening?

11 A.   Yes.

12 Q.   What shift do you typically work?

13 A.   4 p.m. to 11:45 p.m.

14 Q.   Okay.  And at around 6:45 on that evening can you please

15 tell us where you were located?

16 A.   In the area of Andrew Square in South Boston.

17 Q.   What, how were you attired?

18 A.   I was in plain clothes and in an unmarked vehicle.

19 Q.   Okay.  And as you were in that Andrew Square area please

20 tell us what you observed.

21 A.   I observed a gentleman standing in the parking lot of the,

22 at the time it was a Lil' Peach variety store, now it's a

23 Tedeschi's, and I began to watch him.

24 Q.   All right.  And what drew your attention to that

25 individual?

1  A.    In the square as it is an extremely busy area for drug

2  meets because there's an MBTA station across the street and

3  there's a couple, there's a variety store, and a pizza store

4  and a Dunkin' Donuts, and people always try to blend in there

5  and make drug deals.  We've probably caught I'd say over 350

6  people buying and selling drugs in there, right in that little

7  section of South Boston.  So that's a place where we routinely

8  patrol, and if we see somebody standing there and they look

9  like they're watching for a car, we'll hide and wait and watch

10 and see if a drug deal happens.

11 Q.    Okay.  And so were you watching from inside of your car?

12 A.    Yes.

13 Q.    And how far approximately were you from this individual?

14 A.    I had moved a couple times so I don't remember, but just

15 close enough so I could see him.

16 Q.    Okay.  And at some point in time did you see him interact

17 with somebody else?

18 A.    Yes.

19 Q.    Please tell us what you observed.

20 A.    Brima Wurie here, this gentleman off to my right, with a

21 white t-shirt beside Mr. Benzan, he arrived in a white Nissan

22 Altima, brand new car.  He pulled up to the parking lot and let

23 Mr. Wade get into the car beside him.

24 Q.    Okay, and Mr. Wade being who?

25 A.    Fred Wade, that's the gentleman that I was watching.

9

1 Q.   Okay.  So ultimately you learned his identity at a later

2 time?

3 A.   Yes, he's a middle-age, black gentleman, Fred Wade.

4 Q.   Okay.  So he got into the car operated by Mr. Wurie?

5 A.   He did.

6 Q.   And once he got into the car was that the front passenger

7 side?

8 A.   He did, yes.

9 Q.   What happened next?

10 A.   The car turned right onto Dorchester Avenue and then

11 traveled up the street towards D Street, and at one point it,

12 Mr. Wurie, obviously he'd be the only one who'd have access to

13 it, activated the left directional and began a U-turn but then

14 stopped at U-turn and went a little bit further up the street.

15 Then he U-turned and came back.  So he basically went about 150

16 yards up D, up Dorchester Avenue, U-turned and came back and

17 dropped Mr. Wade back about 30 feet from where he initially

18 picked him up.  So he gave him one of these meaningless rides

19 that we talk about.

20 Q.   Okay.  Where were you during the time that the Altima took

21 this path of travel?

22 A.   I followed them.

23 Q.   And were you, how close to the car were you?

24 A.   A little ways back, I mean, we never follow right on their

25 bumper, but there was no other cars between myself and Mr.

1  Wurie.

2  Q.   So you were directly behind Mr. Wurie's car?

3  A.   Yes.

4  Q.   And as you were behind Mr. Wurie's car, were you able to

5  see in the passenger compartment at all?

6  A.   I could see the back of their heads.  I could see

7  movement, and I could see Mr. Wade raise up a little bit,

8  almost as if somebody would be reaching into a pants pocket,

9  but I couldn't see his hands or anything.

10 Q.   Okay.  So you weren't able to see what was going on with

11 either individual's hands within the car?

12 A.   No.

13 Q.   Now, when Mr. Wade got out of the vehicle, you say it was

14 in nearly the same location that he entered?

15 A.   Yes.

16 Q.   What did Mr. Wade do?

17 A.   He walked into a Lil' Peach variety store.

18 Q.   Okay.  And did you see where the Altima went at that

19 point?

20 A.   He drove away towards the main intersections of Dorchester

21 Street, Dorchester Avenue, South Hampton and Cowell, which is

22 Andrews Square.

23 Q.   Okay, and just to be clear is that still be driven by Mr.

24 Wurie?

25 A.   Yes.

1  Q.   All right.  So when Mr. Wade went into Lil' Peach

2  convenience store what did you do?

3  A.   I went in after him, and I had summonsed other squad

4  members to the area because I saw, what I was witnessing I

5  believed to be a drug deal.  So Officer Steven Smigliani

6  arrived and dropped off Officer Christopher Boyle, squad

7  members.  And Boyle and I went into the Lil' Peach and spoke

8  with Fred Wade.  Smigliani followed the Altima operated by Mr.

9  Wurie out of the area.

10 Q.   Okay.  Now with sticking with Mr. Wade for a second, what

11 did you do once Officer Boyle joined you?

12 A.   Told him I was a police and I recovered two eight balls of

13 crack cocaine from his left front pants pocket.

14 Q.   Okay, and what's an eight ball of crack cocaine?

15 A.   3.5 grams of cocaine.

16 Q.   And I'm sorry could you just again tell us where they were

17 found on Mr. Wade?

18 A.   In the pants pocket of Mr. Wade.

19 Q.   Okay.  And did you have an opportunity to speak with Mr.

20 Wade about where those drugs came from?

21 A.   I did.

22 Q.   And what did he say?

23 A.   I told him his rights.  Then I told him he didn't have to

24 say, I said another word, you don't have to say anything.  Do

25 you understand?  He said, yes.  He told me that he just bought

1  them from the man in the car.  He called him B, B as in boy.

2  And I asked him some more questions.

3  Q.   Okay, and what else did he say regarding purchasing drugs?

4  A.   He said that he only sells weight which is larger amounts

5  of drugs.  I said what's the smallest he'll sell?  He says the

6  smallest he'll sell is an eight ball.  I said, where does he

7  live?  He said I don't know where he lives, but he lives

8  somewhere in South Boston.  He said, I meet him in South Boston

9  all the time because he lives here but sometimes I'll meet him

10  at his father's house in Dorchester.  And he said that was on

11  the street off of Topples Street, and they'll have to wait for

12  him there because he's probably driving from South Boston to

13  meet him.

14  Q.   Okay.  And what happened to Mr. Wade at that point in

15  time?

16  A.   He was summonsed into the South Boston Court and charged

17  with possession of Class B, crack cocaine.

18  Q.   Okay.  And what happened with the drugs?

19  A.   They were submitted to the state lab for analysis.

20  Q.   All right.  So once you had that encounter with Mr. Wade,

21  did you communicate that with Officer Smigliani who was

22  following Mr. Wurie?

23  A.   Yes.  Officer Smigliani was made aware of the results of

24  the stop of Mr. Wade.

25  Q.   Okay.  And as a result to that what happened?

13

1   A.    He told me that he watched Mr. Wade U-turn on Dorchester

2   Street and park near the corner of Silva Street, and he told me

3   that, you know, Smigliani was in a pick-up truck, a gray pick-

4   up truck and he was dressed, you know, in jeans and boots and

5   like a t-shirt or something, whatever.  And Mr. Wurie looked at

6   him and said, is it okay to park here, which I don't know why

7   he would do that unless he suspected it was the police, but --

8           MR. BENZAN:  Objection.

9           THE COURT:  That's stricken.

10  A.    So anyways he went up, Mr. Officer Smigliani and some

11  arriving C-6 units arrest him for distribution of cocaine to

12  Mr. Wade.

13  BY MS. LUNDGREN:

14  Q.    Okay.  and then what happened with Mr. Wurie once he was

15  arrested?

16  A.    He was brought to District 6 and booked.

17  Q.    Okay.  And what typically happens with the motor vehicle

18  that somebody is driving involved in a drug transaction?

19  A.    We drive it back to the station and we search it.

20  Q.    Okay.  and is that what happened in this case?

21  A.    Yes.

22  Q.    And can you tell me with regard to Mr. Wurie, was there a

23  search incident arrest made to Mr. Wurie?

24  A.    Yes.

25  Q.    And are you aware of what was recovered from Mr. Wurie?

1    A.    Yes.

2    Q.    And what was that?

3    A.    I believe it was $1,275, two cell phones and some keys.

4    Q.    Okay.  Sergeant Detective Murphy, in front of you do you

5    have a copy of the government's pre-marked exhibits?

6    A.    Yes.

7    Q.    And do you see what we've pre-marked as Exhibit No. 1?

8    A.    Yes.

9    Q.    Is it fair to say that Exhibit No. 1 is a copy of the

10   police report describing the incident that you've just

11   testified to as well as some drug control unit forms regarding

12   the drugs seized from Mr. Wade and the money seized from Mr.

13   Wurie?

14   A.    Yes.

15   Q.    And are those fair and accurate copies of those documents?

16   A.    Yes.

17          MS. LUNDGREN:  Your Honor, I'd like to move to

18   introduce Government's Exhibit 1.

19          THE COURT:  Any objection?

20          MR. BENZAN:  No objection.

21          THE COURT:  Marked as Exhibit 1.

22      GOVERNMENT EXHIBIT NO. 1, MARKED AND ADMITTED

23          MS. LUNDGREN:  Thank you.

24   BY MS. LUNDGREN:

25   Q.    Sergeant Detective Murphy, once Mr. Wurie had been placed

15

1   under arrest did you have an opportunity to speak with him

2   down at the station?

3   A.   I did.

4   Q.   And could you please describe for us the conversation you

5   had with him?

6   A.   I told him his rights again, and then I did in similar

7   fashion what I say to everybody I arrest, I say, in other

8   words, you don't have to say a thing.  And I asked him if he

9   understood, and he said yes.  I asked him his name and where he

10  lived.  And then I asked him about his business in South

11  Boston.

12  Q.   And what did he, how did he respond about why he was in

13  South Boston?

14  A.   He lives at, I think he said he lives at 51 Skeenwell

15  Street in Dorchester, and he said he was in South Boston

16  because he was just cruising around.

17  Q.   Okay.  did you ask him whether or not he had been at the

18  Lil' Peach or in that area?

19  A.   I did; I asked him if he had stopped in there, if he met

20  with anybody, if he had anybody in his car.  Did you talk to

21  anybody?  Those questions, he denied at each time.  He said,

22  no, I didn't, no.

23  Q.   Okay.  And were there other officers working on this

24  investigation with you other than Officer's Boyle and Smigliani

25  as you've already described?

1    A.    Yes.

2    Q.    And who were those officers?

3    A.    Robert England and Kevin Jones.

4    Q.    And is it your understanding that either Officer Jones or

5    Officer England had any opportunity to look at the cell phones

6    which were seized incident to arrest which you've just

7    described?

8    A.    Yes.

9    Q.    And what's your understanding of any information obtained

10   from the cell phones?

11   A.    Officer Jones informed me that he noted a phone number

12   within Brima Wurie's cell phone under the heading my house and

13   that he recorded that phone number.

14   Q.    Okay.  And so there's a phone number attached with that

15   heading my house?

16   A.    Yes.

17   Q.    And did he also have an opportunity to look at what you

18   might call the wallpaper on a phone number; that being the

19   picture that appears when you flip open your cell phone?

20   A.    Yes.

21   Q.    And what appeared on that photo?

22   A.    A photo of a lady back here.

23   Q.    Okay.

24   A.    And with a baby.

25   Q.    Okay.  And did you subsequently come to learn that

1    individual's identity?

2    A.    Yolanda Walker.

3    Q.    So Officer Jones conveyed the information to you about the

4    phone number that he found as well as the picture?

5    A.    He told me about it, yes.

6    Q.    Okay, and did, once he obtained the phone number

7    associated with the heading my house, do you know if he did

8    anything with that phone number?

9    A.    He did.

10    Q.    What was that?

11    A.    He went onto a website that we all have access to.  It's

12    called anywho.  It's almost like typing in Google; when you get

13    to Google website you type in A-N-Y-W-H-O and you can search

14    phone numbers and things like that, like anyone of us can do

15    it.  You go home tonight and do it.

16    Q.    Okay.  And when he placed that phone number into anywho

17    did he receive some information back?

18    A.    He did.

19    Q.    And what's your understanding of what he received?

20    A.    He told me it came back to a person named Crystal at 315

21    Silva Street, Silva Street being the street near where he had

22    parked on the corner of Dorchester Street.

23    Q.    Where Mr. Wurie had parked?

24    A.    Yes.

25    Q.    Okay.  And after receiving that information what did you

18

1  do next?

2  A.    On learning that, I saw the keys that Mr. Wurie had had

3  and I had other squad members come with me and I went to see

4  where 315 Silva Street was--

5  Q.    Okay.

6  A.    --in South Boston.

7  Q.    And so the keys that you're referring to are those keys

8  that were taken again incident to arrest?

9  A.    Yes.

10  Q.    And they were on his person?

11  A.    Yes.

12  Q.    And just very briefly, Sergeant Detective Murphy, going

13  back to the car do you know whether or not or who owned that

14  car?

15  A.    It was a rental vehicle from one of the more popular

16  companies; I don't remember which one.

17  Q.    Okay.  And in your experience in the drug unit, is it

18  typical for you to encounter rental cars?

19  A.    We do often, yes.

20  Q.    Okay.  So again, once you had those keys from Mr. Wurie

21  please explain to us what you did.

22  A.    Just drove to Silva Street and, you know, I'm familiar

23  with the area.  I knew where that was.  I wanted to see where

24  315 Silva Street is, and that's right down from Dorchester on

25  the left hand side.  And Silva Street is a very small street

1  with really no parking at all.  It's like there's no lawns on

2  the houses and the houses come right up to the sidewalk, and

3  it's extremely narrow; it's like a long driveway really.  So we

4  pulled up past the house in an area where the car was able to

5  get off the road, and I walked up to the house by myself.  I

6  left other squad members in the car, and I looked at the house.

7  Q.   Okay, what type of house was it?

8  A.   Three family.

9  Q.   And again you said that you pulled right up to the

10 sidewalk, no yard?

11 A.   No, house just meets, house meets the sidewalk, no yard.

12 Q.   Okay.  And approximately what time of night was this?

13 A.   I don't remember but it was dark.

14 Q.   And being dark were you able to see anything once you were

15 looking at the house?

16 A.   Yes.

17 Q.   What did you see?

18 A.   There were some mailboxes attached to the exterior.

19 Q.   And did you look at the names on the mailboxes?

20 A.   I did.

21 Q.   What did you see?

22 A.   For Apartment 1 the name Crystal and the phone number was

23 on it and written in ink and then Wurie, his last name, W-U-R-

24 I-E.

25 Q.   Okay.  So that was on the exterior of the house?

1   A.   Yes.

2   Q.   And were you able to see in any of the windows?

3   A.   You could see clearly into the first floor because the

4   lights were on.

5   Q.   On?

6   A.   And then the windows were right there.

7   Q.   Okay.  And when you looked in the window can you please

8   tell us whether or not you saw anybody?

9   A.   I could see Yolanda Walker inside the house.

10  Q.   All right.  What did you do after that?

11  A.   I went and got other members of my squad and went up the

12  street.  We walked up to the house and I tried the keys.  I

13  don't remember members of my squad, I don't remember, tried the

14  keys.  It probably could have been me; you'd have to read the

15  report, but opened the front door, the main front door of the

16  house with one of Mr. Wurie's keys.

17  Q.   Okay.  And where did that main front door lead to?

18  A.   Into a small, little foyer, and once you get in there

19  there's a door to your right that goes to Apartment 1 and then

20  a door almost ahead of you to the left that accesses the second

21  and third floor stairway.

22  Q.   So, Sergeant Detective Murphy, then is it fair to say that

23  you entered a common area and not somebody's residence when you

24  went through that main door?

25  A.   Yes.

1   Q.   Okay.  So once you were in the common area please tell us

2   what you did.

3   A.   I first tried the, rather than go right to Apartment 1,

4   which I thought probably was the right apartment, I just wanted

5   to be sure so I tried the keys, in the door that leads upstairs

6   just to make sure he doesn't have access up there either too,

7   you know, so none of the keys opened that door.

8   Q.   Okay.  After you tried that door what did you do next?

9   A.   I tried the keys in Apartment 1 and turned the lock and

10  saw that it worked.

11  Q.   Okay.  And once you saw that it worked what did you do?

12  A.   Knocked on the door.

13  Q.   Okay.  At any point in time using those keys did you ever

14  enter the apartment?

15  A.   No.

16  Q.   And what did you do with the keys once you knocked on the

17  door?

18  A.   I had kept them.

19  Q.   Okay, so you removed them from the lock?

20  A.   Yes.

21  Q.   Once you knocked on the door what happened?

22  A.   Ms. Walker opened the door, and I asked her to step

23  outside rather than ask if I could come in.  I spoke with her

24  briefly at the door while it was open, and I asked her to come

25  outside.

1  Q.   Okay.  So for some period of time the door to Apartment

2  number 1 was open?

3  A.   It was.

4  Q.   And did you observe or detect anything during that time?

5  A.   I could smell burnt marijuana.

6  Q.   And please, sir, describe for us the conversation you had

7  with Ms. Walker.

8  A.   I had asked her, I told her I was there because I arrested

9  a man selling drugs.  I told her the man's name, asked her if

10  she knew him; she said she did.  I asked him if he stays, asked

11  her if he stays there, and she said sometimes I believe.  I

12  said was he there today, and she said yes.  I said did he stay

13  there last night, and she said yes.  And this is what I can

14  basically remember.

15  Q.   Okay.  And as a result of the odor that you detected as

16  well as your conversation, what did you do next?

17  A.   I entered the apartment because it was my intention at

18  this point to seek a search warrant, and we conduct what we

19  call a protective sweep just to make sure there's nobody hiding

20  behind a door or under a bed that could hurt us.  And once we

21  feel that the place is secure and nobody's in there that could

22  do that we leave officers there, and I left and typed a search

23  warrant.

24  Q.   Okay.  So during the time that you freeze that apartment

25  are you conducting a search as well?

23

1  A.   No.

2  Q.   Once that apartment was frozen what did you do?

3  A.    I typed a search warrant and had an ADA read it and then

4  submitted it to a clerk magistrate.  The search warrant was

5  granted, and I went back and searched the apartment.

6  Q.   Okay.  Now, Sergeant Detective Murphy, was there anybody

7  else inside; when you froze the apartment was there anybody

8  else inside?

9  A.   There was an infant baby asleep.

10  Q.   All right, and is that it?

11  A.   Yes.

12  Q.   All right.  So upon receiving approval to execute a search

13  warrant what did you do?

14  A.   Searched the apartment.

15  Q.   And, again, was that you with members of your unit?

16  A.   Smigliani, Boyle and England, yes.

17  Q.   All right.  Now pursuant to executing the search warrant

18  did you recover anything within that apartment at 315 Silva

19  Street?

20  A.   Yes.

21  Q.   And, Sergeant Detective Murphy, do you have the pre-marked

22  Exhibit No. 2 in front of you?

23  A.   It's right here, yes.

24  Q.   And is it fair to say that that contains a police report

25  regarding your search as well as again drug control unit forms

24

1  regarding seized money, drugs--

2  A.   That's --

3  Q.   --the search warrant and the return?

4  A.   --yes.

5  Q.   Are those fair and accurate copies of those documents?

6  A.   Yes, they are.

7  Q.   And, sir, if I could just have you turn to the last page

8  of the exhibit, what we typically call the return, does that

9  list the items that you seized?

10 A.   Yes.

11 Q.   Okay.  And without touching every single item did you

12 recover drugs within the apartment?

13 A.   Yes.

14 Q.   And approximately how much drugs did you recover?

15 A.   At the time we listed as two large plastic bags with over

16 150 grams of crack cocaine, that we've since learned is over

17 200.  Plastic, oh, I'm sorry --

18 Q.   All right.  Sir, let me just stop you right there to

19 describe to the Court where you found that large amount of

20 crack cocaine.

21 A.   It was in a nightstand beside the bed in the master

22 bedroom of this apartment to the left as you face it.

23 Q.   Okay, and did you recover any weapons?

24 A.   Yes.

25 Q.   And ammunition?

1  A.    Yes.

2  Q.    And where did you recover those?

3  A.    They were recovered, my squad members, there was a sock

4  with 40, 6 40-caliber hollow point rounds in it and a Starline

5  9mm Smith & Wesson pistol which was loaded with I believe five

6  rounds and that was in a closet opposite that bed that I just

7  mentioned within the master bedroom.

8  Q.    Okay.  Now you had said earlier that you smelled burnt

9  marijuana.  Did you find any marijuana within the apartment?

10 A.    Yes, we did.

11 Q.    And where did you find that?

12 A.    Some of it was in a tupperware plastic container, and some

13 of it was in a white bag in the same closet that the gun and

14 the 40-caliber rounds were in.  And I also believe that there

15 was some in, right beside the bed on the other nightstand or

16 table, what have you, over to the right as you face the bed.

17 Q.    Okay the same master bedroom?

18 A.    The same one, yes.

19 Q.    All right.  Did you find any remnants of any marijuana

20 that had been smoked or burnt?

21 A.    I believe there was marijuana residue.  There was cigars

22 that are commonly used to package to roll marijuana to smoke

23 in, I remember that.

24 Q.    Okay.  Now, Sergeant Detective Murphy, with regard to

25 personal papers, things like that, did you find anything?

1  A.   There were personal papers in the name of both Brima

2  Wurie and Yolanda Walker as well as photos of both people.

3  Q.   Okay and with regard to, again, items found in the master

4  bedroom, was there clothing?

5  A.   There was.

6  Q.   And could you please describe what types of clothing were

7  in the master bedroom?

8  A.   A man's clothing and woman's clothing.

9        MS. LUNDGREN:  Your Honor, the government would seek

10  to introduce Exhibit No. 2.

11        THE COURT:  Any objections?

12        MR. BENZAN:  No objection, Your Honor.

13        THE COURT:  Marked as Exhibit 2.

14     GOVERNMENT EXHIBIT NO. 2, MARKED AND ADMITTED

15  BY MS. LUNDGREN:

16  Q.   Sergeant Detective Murphy, do you have Exhibit No. 3

17  before you which the government has pre-marked?

18  A.   I do.

19  Q.   What happened to the gun and ammunition once it was seized

20  as a result of that execution of your search warrant?

21  A.   It's placed in a gun locked grid area of C-6 and is

22  transported to the Boston Police Ballistics Unit at 1 Trump

23  Plaza and tested.

24  Q.   Okay and is it your understanding that the certificates in

25  Exhibit 3 relate to the gun which you seized?

1  A.    Yes.

2  Q.    And the ammunition as well?

3  A.    Yes.

4  Q.    And is it fair to state that the Boston Police Department

5  found out the gun and the ammunition, in fact, were a gun and

6  ammunition under the statute?

7  A.    Yes.

8  Q.    If I could have you turn to the fourth page of that

9  document; do you recognize what that is?

10 A.    Yes.

11 Q.    And is that from the Boston Police Department, Latent

12 Print Unit?

13 A.    Yes.

14 Q.    And is it fair to say that no linked prints were recovered

15 from that firearm?

16 A.    Yes.

17 Q.    And lastly, Sergeant Detective Murphy, you had mentioned

18 that the gun had been stolen; is that correct?

19 A.    Yes.

20 Q.    And of the last page of that exhibit described the trace

21 performed by the ATF regarding where that weapon had been

22 stolen from?

23 A.    Yes.

24 Q.    And do you know what state it was stolen from?

25 A.    Georgia.

1      MS. LUNDGREN:  Your Honor, the government would seek

2  to introduce Exhibit No. 3.

3      THE COURT:  Any objection?

4      MR. BENZAN:  Your Honor, I would just object to the

5  portion of page 4.  Actually, it's page 5, the section that's

6  entitled Recovery Information.  It's entitled Possessor, and it

7  has my client's name on there.  I would ask that that be made

8  by the record or would that be too much?

9      THE COURT:  All right.  I'll accept the document

10  recognizing your concern about that entry.

11      MR. BENZAN:  Thank you, Your Honor.

12      THE COURT:  Mark this Exhibit 3.

13      GOVERNMENT EXHIBIT NO. 3, MARKED AND ADMITTED

14  BY MS. LUNDGREN:

15  Q.   Sergeant Detective Murphy, what's your understanding with

16  regard to what happened to the drugs that you seized from 315

17  Silva Street?

18  A.   They were placed in a drug safe area C6 and brought to the

19  Boston Police Drug Evidence Holding Facility in Hyde Park by

20  drug depository personnel and from there they're conveyed to

21  the state lab for analysis.

22  Q.   Okay.  And again that's also happened with the drugs taken

23  from Mr. Wade on that evening?

24  A.   Yes.

25  Q.   Okay.  And you have before you, sir, a pre-marked Exhibit

1   No. 4?

2   A.   I do.

3   Q.   And are these the analysis certificates from the lab

4   indicating the testing conducted on the drugs you submitted?

5   A.   Yes.

6   Q.   And is it fair to say that the first pages are the drugs

7   recovered from Mr. Wade?

8   A.   Yes.

9   Q.   And the second page are the drugs recovered from 315 Silva

10  Street?

11  A.   Yes.

12  Q.   And just if you could explain to the Court, how, what

13  weight of drugs were seized from Mr. Wade?

14  A.   Two bags from Mr. Wade, the two eight balls of cocaine

15  weighed 6.40 grams.   They were found to be cocaine base.

16  Q.   Okay.   And looking at the second certificate the drugs

17  used from 315 Silva Street, what was the weight of those drugs?

18  A.   215.80 grams cocaine base.

19        MS. LUNDGREN:   Your Honor, the government seeks to

20  introduce Exhibit No. 4.

21        MR. BENZAN:   No objection, Your Honor.

22        THE COURT:   Marked as Exhibit 4.

23     GOVERNMENT EXHIBIT NO. 4, MARKED AND ADMITTED

24  BY MS. LUNDGREN:

25  Q.   Sergeant Detective Murphy, after executing the search

1  warrant at 315 Silva Street, did you have an opportunity again

2  to speak with Mr. Wurie?

3  A.   I remember speaking to him another time, yes.

4  Q.   Okay.  And do you remember your conversation with him?

5  A.   I remember asking him at one point why the keys from his

6  ring fit Apartment 1--

7  Q.   And --

8  A.   --at 315 Silva Street.

9  Q.   --what was his response?

10 A.   I believe he said I don't know or something along those

11 lines.

12 Q.   Sergeant Detective Murphy, since becoming involved in this

13 case have you had an opportunity or have you become aware of

14 previous convictions of Mr. Wurie?

15 A.   He was showing me some, yes.

16 Q.   Okay.  And you have pre-marked Exhibit No. 5 before you?

17 A.   I do.

18 Q.   And are these a series of convictions from various courts

19 for violent offenses such as assault and battery dangerous

20 weapon, assault and battery, resisting arrest--

21 A.   Yeah, yes they are.

22 Q.   --such as those?  In particular, Sergeant Detective

23 Murphy, are you aware of an incident, have you become aware of

24 an incident which occurred on September 8th, 2002 in Boston?

25 A.   I had heard about it before, but I just read this police

1   report too.

2   Q.   Okay.  So is it fair to say that basically it involves in

3   the bottom, right-hand corner of page 120 there's a Boston

4   police report of that date?

5   A.   On page 120?

6   Q.   Yes.

7   A.   Yes.

8   Q.   Actually 120 through 122, is that two different police

9   reports?

10   A.   Yes.

11   Q.   Regarding the same incident?

12   A.   Yes.

13   Q.   And if you could just very briefly describe for us your

14   understanding of the incident which occurred on September 8th,

15   2002?

16   A.   That Mr. Wurie led the police on a motor vehicle chase.

17   He was the operator of a white, Ford Taurus.  And at one point

18   he struck a uniformed Boston police officer and fled the scene.

19   Q.   All right.

20   A.   The car was later found abandoned.

21   Q.   Now as a result of that incident, are you aware that as

22   indicated in the certified copy of conviction following that

23   that Mr. Wurie was convicted for assault and battery with a

24   dangerous weapon--

25   A.   Yes.

1   Q.   --as well as an accessory after charged related to an

2   assault?

3   A.   Yes.

4   Q.   And are you also aware that he was on probation for that

5   matter when you arrested him on September 5th, 2007?

6   A.   Correct.

7          MS. LUNDGREN:  Your Honor, the government would seek

8   to introduce Exhibit No. 5.

9          THE COURT:  Any objection?

10         MR. BENZAN:  No objection.

11         THE COURT:  Marked as Exhibit 5.

12       GOVERNMENT EXHIBIT NO. 5, MARKED AND ADMITTED

13  BY MS. LUNDGREN:

14  Q.   And lastly, Sergeant Detective Murphy, we do have

15  government's pre-marked Exhibit No. 6 before you.

16  A.   I have 5, 6 might be in some envelope.  I'll see if I have

17  a copy of it.  I don't know if I've got 6.

18  Q.   Okay.

19         MS. LUNDGREN:  May I approach, Your Honor?

20         THE COURT:  Yes.

21  A.   Okay.

22  BY MS. LUNDGREN:

23  Q.   Sergeant--

24         MR. BENZAN:  I'm sorry, Your Honor, if can we go back

25  to Exhibit 5.  There were, there's included there pages of

1   documents not testified so I would object to--

2        THE COURT:  You can examine; I am assuming that these

3   are records that are reflected.  Maybe I shouldn't assume, but

4   are these documents that are reflecting arrests that are in

5   the--

6        MS. LUNDGREN:  Absolutely, they're certified copies

7   of convictions aside from the two Boston police incident

8   reports which I pointed out through Sergeant Detective Murphy's

9   testimony, but other than that they're all certified copies of

10  convictions as obtained from various courts.

11       THE COURT:  Okay. and these are all reflected in his

12  arrest record?

13       MS. LUNDGREN:  They're all within the BOP, that's

14  correct.

15       THE COURT:  All right.  I'll let it counsel, I'll

16  accept that representation.

17       MR. BENZAN:  Thank you.

18  BY MS. LUNDGREN:

19  Q.   Now Sergeant Detective Murphy, very briefly with regard to

20  Exhibit No. 6, have you had an opportunity as a result of

21  preparing for this detention hearing to see that police, to see

22  that exhibit?

23  A.   Yes.

24  Q.   And what is that?

25  A.   It's a copy of a Boston police report that's dated

1   7/17/2007 with Mr. Wurie's name on it.

2   Q.   Okay.  And does that involve an incident; does that

3   involve, is that incident involving Mr. Wurie from that date?

4   A.   Yes.

5   Q.   And could you please very briefly again summarize the

6   incident as recorded in the Boston police report?

7   A.   Apparently Mr. Wurie and Ms. Walker, seated in the rear

8   here, had a baby together, and he went to visit her in the

9   hospital and learned that she had named the baby.  He didn't

10  like the name that she chose, and he pushed her over a toilet

11  and she had back and leg pain.

12  Q.   Okay.  And are you aware of how this incident was

13  reported?  Does it indicate in the summary there?

14  A.   A detail officer, Officer McGee, was contacted by hospital

15  security if I'm answering the question correctly.

16  Q.   Yes, but does it indicate, in other words, Sergeant

17  Detective Murphy, that police spoke directly with the victim of

18  this incident, Ms. Walker?

19  A.   Yes.

20  Q.   And that they learned--

21  A.   They said Officer McGee responded to her room 1008 and

22  spoke to her, and that's what she told police.

23  Q.   Okay.  And are you aware of whether or not there are any

24  convictions as a result of this incident?

25  A.   I believe it was dismissed.

1        MS. LUNDGREN:  Your Honor, the government seeks to

2   introduce Exhibit No. 6.

3        MR. BENZAN:  No objection.

4        THE COURT:  Marked as Exhibit 6.

5     GOVERNMENT EXHIBIT NO. 6, MARKED AND ADMITTED

6        MS. LUNDGREN:  Your Honor, the government has no

7   further questions at this time.

8        THE COURT:  Cross examination.

9        MR. BENZAN:  Thank you.

10                    CROSS EXAMINATION

11   BY MR. BENZAN:

12   Q.   Good afternoon, Sergeant.

13   A.   Good afternoon.

14   Q.   You admit that on September 5th, 2007, that you didn't know

15   my client, Mr. Wurie?

16   A.   I did not know him.

17   Q.   Hadn't you seen him before?

18   A.   No, I don't think I did.

19   Q.   And so on September 5th of 2007, you didn't know if at any

20   point he had been to 315 Silva Street?

21   A.   No, I hadn't met him before, sir.

22   Q.   So you never saw him at that address?

23   A.   I don't think I did.

24   Q.   And the only information that you received that night was

25   that he had slept at that address the night before?

1  A.    That's incorrect.

2  Q.    Well did you get that information?

3  A.    I received information from Mr. Wade that this man lives

4  in South Boston, and then I --

5  Q.    And my question specifically, sergeant, was on September

6  5th, 2007, you received information that he had slept at 315

7  Silva Street the night before?

8  A.    I did receive that information.

9  Q.    On September 5th you also received some information that he

10  was at that location earlier in the day?

11  A.    Yes.

12  Q.    You have absolutely no information, did not receive any

13  information during your investigation with respect to when that

14  gun was placed in that residence?

15  A.    Correct.

16  Q.    You have absolutely no information regarding your

17  investigation to indicate when any of the drugs that you

18  mentioned in your direct examination got placed in that

19  residence?

20  A.    I don't know when they were placed there, no.

21  Q.    So you don't have any personal knowledge that Mr. Brima

22  Wurie was ever in the same, in that residence, at the same time

23  as the drugs or the gun, correct?

24  A.    I couldn't say that, no.

25  Q.    You indicate on direct examination that Mr. Wade was, you

37

1    were asked what happened to Mr. Wade and you, you told us that

2    he was summonsed into South Boston District Court.

3    A.    He was.

4    Q.    And by that you mean he was let go?

5    A.    He wasn't arrested; he was summonsed, yes.

6    Q.    So that's your testimony.  He wasn't arrested; he was let

7    go, and then he wasn't given a summons that day?

8    A.    That's not how it works.  We submit an application for

9    complaint to the court, and the court records it, sets a date

10   and mails him a summons in that manner, and then he's required

11   to respond on that date.

12   Q.    So when you tell us now that he wasn't arrested, that he

13   was let go, from where is he let go?

14   A.    The Lil' Peach parking lot.

15   Q.    And what's that address?

16   A.    I don't know the number Dorchester Avenue, but it's right

17   at the corner of Dorchester Avenue and Dorchester Street,

18   opposite the Andrews Square MBTA Station.  The corner street

19   would be Leeds on one side and then Dorchester Street on the

20   other.

21   Q.    But he wasn't at the, you're telling me he wasn't at the

22   intersection of Dorchester and Leeds?

23   A.    It's right there; it's like from me to, uh, I don't know,

24   where Ms. Black is sitting.  It's a small area; it's a smaller

25   parking lot.

1   Q.   Were you at that address or that location when you were,

2   when he was stopped and then--

3   A.   Well, I stopped him inside the Lil' Peach parking, Lil'

4   Peach store.

5   Q.   So that's--

6   A.   Right beside Leeds Street.

7   Q.   It is?

8   A.   Oh, yeah, yeah.

9   Q.   So back, so we know now Dorchester and Leeds is where you

10  stopped Mr. Wade?

11  A.   No.  I stopped him inside the Lil' Peach store, and I told

12  you I didn't know the exact address so I'm just kind of giving

13  you some intersecting streets as a landmark.  I can find out

14  the number Dorchester Avenue if you want, but it's the store

15  itself.

16  Q.   But you're all right, is it your testimony right now that

17  the Lil' Peach store is not on corner of Dorchester and Leeds?

18  A.   No, that's where it is.

19  Q.   Okay

20  A.   But now it's a Tedeschi's.

21            THE COURT:  But you don't know the number?

22            THE WITNESS:  I just--

23            THE COURT:  You don't know the --

24            THE WITNESS:  --don't know the exact address, Your

25  Honor.

1  BY MR. BENZAN:

2  Q.   And had you seen, and you hadn't seen Mr. Wade prior to

3  this date as well?

4  A.   I hadn't met any of these people before; I hadn't met Mr.

5  Wade or Mr. Wurie or Ms. Walker.  I didn't know anyone.

6  Q.   And he was with the second gentleman?

7  A.   He was.

8  Q.   And you began your direct testimony telling us that when

9  you arrived at that location that you saw Mr. Wade and you

10  focused your attention on Mr. Wade?

11  A.   Yes.

12  Q.   You didn't see Mr. Wade arrive?

13  A.   No.

14  Q.   You have, you can't testify via personal knowledge with

15  respect to how long Mr. Wade was there?

16  A.   No.

17  Q.   You can't tell us with whom he may have interacted prior

18  to your arrival?

19  A.   I can tell you he told me who drove him there, but I

20  didn't see it.

21  Q.   My question is during, you can't tell us how long he was

22  there?

23  A.   I only think I watched him for like five minutes to eight

24  minutes, but prior to that, I don't know, sir.

25  Q.   So my question was you can't tell us how long he was at

40

1  that address?

2  A.   You know, at least five to eight minutes that I saw; prior

3  to that I don't know.

4  Q.   And during his entire time there you can't tell us with

5  whom he interacted?

6  A.   When I saw him he wasn't with anybody; he was just like

7  using a cell phone and looking around like he was waiting for a

8  car.  And I didn't see him talk to anybody until he got into

9  the car with Mr. Wurie.

10  Q.   But I'm asking you, you can't, he may have talked to other

11  people during the time --

12  A.   Before I got there?

13  Q.   Right.

14  A.   Anything is possible.  I didn't see it.

15  Q.   So that's what my question is.

16  A.   Sure.

17  Q.   You can't testify that?

18  A.   No.

19  Q.   Right?  You don't know where he came from prior to being

20  at the Lil' Peach store?

21  A.   No.

22  Q.   And same thing with the gentleman that he was with?

23  A.   I don't know.

24  Q.   You didn't search that gentleman?

25  A.   No.

1  Q.   You didn't search that gentleman's car?

2  A.   I don't think we did, no.

3  Q.   So when you talk about a conversation that you had with

4  Mr. Wade, you don't know if he was telling the truth?

5  A.   Well, I can say that I've been doing this 23 years, and

6  I've made over--

7  Q.   Sergeant,--

8  A.   --8,000 arrests.

9  Q.   --my simple question was --

10 A.   I think he was.

11 Q.   All right.

12 A.   I've talked to a lot of people, if I was going to preface

13 this, and I get lied to a lot and a lot of people tell me the

14 truth.  And, you know, anybody can be fooled because we're all

15 human, but I believed this guy.  I believed what he was telling

16 me.

17        THE COURT:  So when he was, could you just tell me,

18 when was he with someone else?

19        THE WITNESS:  When he went into the Lil' Peach store,

20 Your Honor, there was a man inside that was waiting for him

21 that said that he was the one that drove Wade to the location.

22 So he got out of Wurie's car and went to retrieve his friend,

23 obviously, to get a ride back home.

24        THE COURT:  Okay.

25 BY MR. BENZAN:

42

1  Q.   But he didn't tell you that?

2  A.   He said that's the man that drove me there; so that's what

3  I assumed.   It could be because they were coming back out of

4  the store.

5  Q.   Did you see both men leave?

6  A.   No, I encountered them in the store.

7  Q.   But you spoke to Mr. Wade outside?

8  A.   In the store at first; then I brought him outside.

9  Q.   All right.  And then you told us just minutes ago that he

10  was allowed to leave that area?

11  A.   He was.

12  Q.   All right.  And that other gentleman was allowed to leave

13  that area?

14  A.   Yes.

15  Q.   Okay.  My question is did you see them both leave

16  together?

17  A.   I don't remember.

18  Q.   Now, you indicated that Officer Smigliani followed Mr.

19  Wurie from that area?

20  A.   Yes.

21  Q.   After he was seen?

22  A.   Uh-huh.

23  Q.   And that Mr. Wurie drove to a different location?

24  A.   Yes.

25  Q.   And at that different location Mr. Wurie was stopped and

43

1   arrested?

2   A.   He U-turned and parked, and then he was arrested.

3   Q.   And did you know the address of where he was arrested?

4   A.   On Dorchester Street near the corner of Silva Street.

5   Q.   In that packet, do you have his booking sheet, Mr. Wurie's

6   packet?

7   A.   I probably do.  Do I?  I don't know.

8           MS. LUNDGREN:  It's probably in an exhibit.

9           MR. BENZAN:  May I approach the bench, Your Honor?

10          THE COURT:  Yes.

11  BY MR. BENZAN:

12  Q.   Do you recognize it what that piece of paper?

13  A.   Yes.

14  Q.   And is it fair to say that's the booking sheet?

15  A.   Yes.

16  Q.   Of Mr. Wurie?

17  A.   Yes.

18  Q.   And within that, on that booking sheet it tells us,

19  there's a--

20  A.   Location of arrest.

21  Q.   --an area where it says location of arrest?

22  A.   Yes.

23  Q.   And what does that booking sheet indicate for location of

24  arrest is?

25  A.   It says Dorchester and Leeds Streets.

44

1   Q.   In South Boston?

2   A.   Yes.

3   Q.   And what time was he, does it say that he was arrested?

4   A.   It says 18:45.

5   Q.   And what time was he booked?

6   A.   19:12.

7   Q.   Is that--

8   A.   I can assume that it says that.

9   Q.   --is that your recollection that he was arrested around

10  18:45 or 6:45 at night?

11  A.   I assume so if it says that there, but I don't know.

12  Q.   And if it says that he was booked at 19:12 is that 7:12?

13  A.   Yes.

14  Q.   Is it the normal procedure that the person doing the

15  booking would make these entries as the booking procedure is

16  occurring?

17  A.   Yes.

18  Q.   Now, you told us that when Mr. Wurie was stopped and

19  arrested that certain items were taken from him at some point?

20  A.   Yes.

21  Q.   All right.  You told us that monies were taken from him?

22  A.   Money, two cell phones and keys.

23  Q.   And that's all that was taken?

24  A.   I believe so.

25  Q.   And we'll talk about where and when those were taken from

1  him, but no weapons were found on him?

2  A.   No weapons.

3  Q.   Eventually, you put charges or placed charges, charged him

4  with some weapon charges?

5  A.   Yes.

6  Q.   And those weapon charges were a result of your search

7  warrant search?

8  A.   Yes.

9  Q.   And it says on your return to the search warrant that the

10 search occurred--

11         MR. BENZAN:  If I may, Your Honor?

12         THE COURT:  Yes, uh-huh.

13 BY MR. BENZAN:

14 Q.   --on September 5th, 2007, correct?

15 A.   11 p.m., correct.

16 Q.   11 p.m.  So is it fair to say that after 11 p.m. these

17 items all listed on your return were found?

18 A.   Yes.

19 Q.   And you already mentioned that the ammunition and the

20 firearm were located and reported on the search warrant return?

21 A.   Yes.

22 Q.   And you're certain that prior to 19 or 7:12 p.m. that

23 apartment was not searched?

24 A.   No.

25 Q.   Do you, can you tell us then why looking back at the

1  booking sheet that's timed at 19:12 why it indicates that in

2  the bottom section, why it's listed that Mr. Wurie is armed?

3  A.   I don't know maybe based upon his past record or

4  something, you know, they usually, they can find histories of

5  people if they've attempted suicide, they'll note that or if

6  they're violent, maybe something in his past.  I think he's got

7  something down on his record; that could be what it is.

8  Q.   The--

9        MR. BENZAN:  May I again approach, Your Honor?

10       THE COURT:  You don't need to ask.

11 BY MR. BENZAN:

12 Q.   This is another booking photo--

13 A.   Okay.

14 Q.   --booking sheet, right?

15 A.   Yes.

16 Q.   And for whom is that person?

17 A.   Fred Wade.

18 Q.   That indicates that Mr. Wade was indeed arrested, wasn't

19 he?

20 A.   It appears so.  I thought he was summonsed, but it's a

21 booking sheet for him, so.

22 Q.   And the date of his arrest?

23 A.   Same date.

24 Q.   And the time of his arrest?

25 A.   Same time.

1  Q.   Same time, and it indicates that not only he was arrested

2  at the same time as Mr. Wurie; he was also, based on this

3  booking sheet, arrested at the same location as Mr. Wurie.

4  A.   They just used the one intersection where the incident

5  started; they don't put where they're exactly apprehended so

6  the loner used Dorchester and Leeds.  Say like --

7  Q.   My --

8  A.   --same length--

9  Q.   --my question, Sergeant Murphy, was--

10  A.   --this is Dorchester and Leeds.

11  Q.   --this is what your report indicates the location of

12  arrest is at Dorchester and Leeds in South Boston?

13  A.   Yes.

14  Q.   That would be the same address where it indicates that Mr.

15  Wurie was arrested?

16  A.   Yeah, but he wasn't arrested there; they just used that

17  thing.  I thought we had summonsed Wade.  We catch 500 people a

18  year.  It's hard to remember.

19       MR. BENZAN:  Motion to strike, Your Honor --

20       THE COURT:  It's stricken.

21       MR. BENZAN:  --everything after the--

22  BY MR. BENZAN:

23  Q.   Looking back at this booking sheet for Mr. Wade, it

24  indicates his time of arrest as well?

25  A.   Yeah, it did, 18:25.

48

1  Q.   And when he was booked at what time?

2  A.   19:30, I can't read it, 6 I think.

3  Q.   19:30 or sometime after Mr. Wurie was booked?

4  A.   Yes.

5  Q.   You indicated that personal papers from 315 Silva Street

6  were some personal papers of Mr. Wurie were located?

7  A.   Yes.

8  Q.   But nothing that you found stated that Mr. Wurie, that was

9  his address?

10 A.   I don't know; I'd have to look at them.  I don't remember.

11 Q.   But you can't testify to that today?

12 A.   I haven't had any time to review this at all.  I worked

13 until midnight last night.  I did a training course all day

14 today--

15 Q.   My--

16 A.   --and just came here now, so--

17 Q.   --so my question is--

18 A.   --I just barely had time to read this.

19 Q.   --all right, you can't testify?

20 A.   No, I haven't seen any of it since this incident.

21 Q.   The incident report that you looked at and testified to

22 with respect to the assault and battery charge dealing with Mr.

23 Wurie, you testified that it was a police chase?

24 A.   Can I look at it again?

25 Q.   Certainly.

1  A.   Yeah.  Yeah, it said led police on slow speed pursuit

2  through various streets of Dorchester and Roxbury.

3  Q.   And they used the word slow?

4  A.   That's what it says, yeah.

5           MR. BENZAN:  One moment, Your Honor?

6           THE COURT:  Yes.

7           MR. BENZAN:  Thank you.

8  BY MR. BENZAN:

9  Q.   Sergeant, you testified with respect to, to speaking to

10 Mr. Wurie at the police station?

11 A.   Yes.

12 Q.   So when he was at the police station there's a counter

13 where the booking procedure takes place?

14 A.   There is.

15 Q.   And were you present over where Mr. Wurie was booked?

16 A.   I was, I don't remember if I was there when he was booked

17 or not, but I remember speaking to him in that area.

18 Q.   And that booking procedure at that counter is where Mr.

19 Wurie's personal information is given?

20 A.   Yes.

21 Q.   His name, date of birth, all that information is taken at

22 that counter?

23 A.   He's asked those questions and responds, and it's

24 recorded, yes.

25 Q.   His personal belongings are taken from him at that

50

1   location?

2   A.   Yes.

3   Q.   The items you mentioned were taken into custody at the, at

4   the booking desk; is that right?

5   A.   I don't know if they took them at the desk or not, but

6   they probably did.

7   Q.   And is it your recollection that you were there when, at

8   the booking desk?

9   A.   I don't remember.  If I don't tell you, as I said, not to

10  make excuses, but we arrest a lot of people.  It's just like

11  another day at the office.  So they don't tell you who was

12  there on the booking sheet, but I remember speaking to him in

13  the holding cell area.

14  Q.   And it's the normal procedure to take property at that, at

15  the booking desk?

16  A.   For the most part, yes.

17  Q.   And based on the booking report, Officer Boyle is the one

18  who searched Mr. Wurie?

19  A.   Sir, if it says that then, yes.

20  Q.   He was placed in the cell and read his rights by Officer

21  Smigliani?

22  A.   He could have given him his rights too, but I told him his

23  rights.  So oftentimes it happens a lot like I'll give him,

24  I'll always give somebody the rights to talk to, and then the

25  booking officer will give them their rights.  And I just read

1  them to him verbatim because I can remember them, and I told

2  him.  In other words, you don't have to say a thing.

3  Q.   You indicated that the car that Mr. Wurie was seen driving

4  was taken from the location where he was found and brought to

5  different location?

6  A.   Yeah, we usually grab them into the station and search

7  them.

8  Q.   And you searched this car?

9  A.   Yes.

10  Q.   And there were no--

11  A.   Nothing, no drugs.

12  Q.   --record of drug distribution at all found in that car?

13  A.   It was a nice clean rental car.

14  Q.   And with respect to the items that you found of the search

15  of Mr. Wurie, you didn't find any drugs on him?

16  A.   No drugs.

17  Q.   You didn't find any drug paraphernalia by meaning any

18  plastic bags?

19  A.   Just what I had mentioned earlier.

20  Q.   You didn't find any drug notes or anything like that?

21  A.   No.

22  Q.   And you didn't mention that the monies found, the amount

23  of money found was just in, in one group, for lack of a better

24  word?

25  A.   I don't think I was asked that, but I don't remember if it

1   was.

2   Q.   But if it had been in different, separated in different

3   ways you would have remembered that; that would have been

4   noted?

5   A.   It might have been noted, certainly.

6   Q.   And it's not noted in your memory?

7   A.   I don't remember, sir.

8   Q.   You certainly didn't testify to it before any grand jury,

9   right?

10  A.   I don't think I did, no.

11          MR. BENZAN:   I have no other questions.

12          MS. LUNDGREN:   The government has nothing further,

13  Your Honor.   We're ready to argue with it.

14          THE COURT:   You may step down.

15          THE WITNESS:   Thanks.

16      WITNESS EXCUSED

17          THE COURT:   Do you have any further witnesses?

18          MS. LUNDGREN:   No further evidence, Your Honor.   The

19  government's ready to argue detention if the Court would like

20  to hear.

21          THE COURT:   Does the defendant have any witnesses?

22          MR. BENZAN:   No witnesses, Your Honor.

23          THE COURT:   Now, just tell me was there an interview

24  done?

25          MR. BENZAN:   There was not.

1          THE COURT:  Huh?

2          MR. BENZAN:  No, there was not.  I did, Your Honor,

3    speak just today with pretrial services about a possible

4    interview--

5          THE COURT:  All right.

6          MR. BENZAN:  --and would ask the Court to--

7          THE COURT:  Let me tell you that there, I'm not going

8    to consider conditions of release without an interview.  So do

9    you want to argue now, or do you want to go through the

10   interview and argue?  What do you want to do?

11         MR. BENZAN:  I would wait for the interview, Your

12   Honor, and ask, I would ask for that.

13         MS. LUNDGREN:  Your Honor, the government can provide

14   just a very brief argument--

15         THE COURT:  While it's fresh in your mind?

16         MS. LUNDGREN:  --just so it's on the record.  Well,

17   it's fresh in my mind.

18         THE COURT:  All right.  Why don't I do that?  I'll

19   hear from the government.  If you want to respond, fine, but

20   I'll allow you another opportunity--

21         MR. BENZAN:  Thank you.

22         THE COURT:  --when the, after the interview.

23         MS. LUNDREN:  Your Honor, very briefly, as stated at

24   the initial appearance and arraignment, the government moved

25   for detention under three different factors and that's

1  3142(f)(1)(C), the fact that Mr. Wurie has been indicted for

2  Controlled Substances Act violation, under Subsection D he's

3  previously been convicted of two or more offenses of drugs or

4  violence, and in this case those being multiple violent

5  offenses, and under E this also involves a possession of a

6  firearm.

7         So when you're looking at the factors to be

8  considered by the Court in deciding whether or not to detain an

9  individual, first of all, Your Honor, in this case there is a

10 presumption based on two separate grounds, the presumption of

11 detention.  One presumption is that he's previously been

12 convicted of prior felonies, violent felonies; and that's

13 Exhibit No. 5, I believe.  He's been convicted of a least four

14 separate violent offenses.  And again, Your Honor, the

15 presumption, the second presumption is that he has violated the

16 Controlled Substances Act in the current indictment.  As to the

17 nature and circumstances of the offense, I would point out to

18 the Court that obviously here there is a significant amount of

19 crack cocaine, over 215 grams according to the state analysis

20 as well as a gun and several rounds of ammunition making that

21 gun ready to use.

22        The government would argue that the weight of the

23 evidence here is incredibly strong.  We have seasoned drug

24 control officers were familiar with the area, familiar with the

25 way in which drugs are delivered and distributed seeing the

1   classic drug distribution, and then when they're executing the

2   search warrant finding very easily in the main bedroom where

3   there is pictures of Mr. Wurie, there's men's clothing

4   indicating that he had, in fact, was living there as well, some

5   statements of the woman who answered the door, Yolanda Walker,

6   saying that Mr. Wurie had just stayed there the night before,

7   in the bedroom is found the gun with crack cocaine.

8           As to the history and character of the defendant

9   another thing to take into account, Your Honor, is his criminal

10  history.  As I mentioned he has four convictions for violent

11  offenses.  He qualifies as a career offender and thus is

12  looking at significant time.  In addition, Your Honor, he was

13  on probation for the assault and battery dangerous weapon which

14  is what Sergeant Detective Murphy testified to as hitting a,

15  excuse me, a uniformed police officer with a motor vehicle.  So

16  he was on probation for that offense at the time that the

17  incident offense before this Court occurred.

18          And lastly, Your Honor, in terms of considering the

19  danger to community, again it's a drug and gun case.  The drugs

20  plague neighborhood cities in Boston.  Certainly having a gun

21  leads to violence and violent offenses.  This is a gun that was

22  stolen from somebody's residence down in Georgia.  So by virtue

23  of the fact that he is in possession of a firearm he is a

24  danger to the community.

25          THE COURT:  Thank you.  Do you want to be heard?

56

1        MR. BENZAN:  With one respect, Your Honor, I would

2   be, I'd ask to be heard today, and that would be the, my

3   argument opposition with respect to the nature and

4   circumstances of the charges.  I'd ask the Court to weight its

5   decision, it's future decision, heavily on the facts.  And the

6   government points to the large amounts of cocaine that was

7   found at this location, and I would argue this, that it could

8   be ten times as much.  It's not the amount that they found  I

9   would ask, ask the Court to stress upon but rather the

10  connection between Mr. Wurie and the drugs that they found.  I

11  would ask you, the Court to take special note of the lack of

12  connection with respect to Mr. Wurie in that the drugs that

13  were found, the lack of connection between the gun and Mr.

14  Wurie.  There's absolutely no evidence before this Court that

15  Mr. Wurie had any knowledge with respect to either the drugs or

16  the gun.  There's absolutely no evidence before this Court with

17  respect to what the government presented that would indicate

18  that Mr. Wurie knew about those contrabands, those items of

19  contraband or that he intended to possess them.  So again the

20  only information that the Court has with respect to Mr. Wurie

21  and the drugs at that, at some point he was at that address; at

22  some point the police found those items at that address.  But

23  there's nothing linking Mr. Wurie in a temporal issue or in a

24  temporal way of him being in the same place at the same time

25  with those items.  He was arrested with common, everyday items,

1   with cash and a cell phone, items that every human being

2   practically in today's society has on them.  Again, and there

3   was no, nothing else that's incriminating on Mr. Wurie.  I

4   would save my other arguments with respect to his character and

5   his family and his background after he's been interviewed.

6          THE COURT:  Okay.  Can you do the interview today?

7          PRETRIAL SERVICES:  Yes.

8          THE COURT:  Thank you.  When do you want to come back

9   to argue, counsel?

10          MR. BENZAN:  I can be here tomorrow afternoon, Your

11   Honor.  The government--

12          MS. LUNDGREN:  I apologize, Your Honor.  I don't want

13   to throw a monkey wrench into the schedule.  That's a little

14   bit tough for me.  I could do Thursday afternoon?

15          MR. BENZAN:  I can't do Thursday.

16          MS. LUNDGREN:  Friday afternoon?

17          MR. BENZAN:  Friday is okay.

18          MS. LUNDGREN:  I could do Friday afternoon, Your

19   Honor.

20          THE COURT:  All right.  We'll, umm, Friday at 3:30,

21   and actually you can, if you can, you want to do the interview

22   on Friday?

23          PRETRIAL SERVICES:  Oh, I'm not here on Friday.

24          THE COURT:  Okay, so you'll do it--

25          PRETRIAL SERVICES:  --(inaudible - #4:20:31). If you

58

1  want to wait until Friday to have your interview done.  If

2  he's brought in early, then Officer O'Brien whose case it is

3  could do the interview at that time.

4         THE COURT:  How are we doing for time?

5         THE MARSHALL:  On Friday?

6         THE COURT:  No, no for now.  Do we have time, can we

7  keep him here?

8         THE MARSHAL:  No.  I believe they're going to be

9  leaving as soon as this hearing is over, but on Friday we'll be

10 in here first thing in the morning and can talk to him then.

11        THE COURT:  All right.

12        MR. BENZAN:  Your Honor, can I go back to Thursday

13 afternoon?

14        THE COURT:  Yes.

15        MR. BENZAN:  Thanks.

16        THE COURT:  I think so.  What do we have on Thursday?

17 All right so let's do Thursday then at 2:30, and bring him in

18 early on Thursday.  Can you do the interview Thursday morning?

19        PRETRIAL SERVICES:  YES.

20        THE COURT:  Okay so the interview will take place

21 Thursday morning.  Okay and we'll have the continued argument

22 only at 2:30 on Thursday.

23        MS. LUNDGREN:  Thank you, Your Honor.

24        THE CLERK:  Court's in recess.

25 //

59

CERTIFICATION

1

2      I, Maryann V. Young, court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   digital sound recording of the proceedings in the

5   above-entitled matter.

6

7   /s/ Maryann V. Young              December 1, 2008

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MARYANN V. YOUNG**
**Certified Court Transcriber**
**(508) 384-2003**