UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 08-10071-RGS

UNITED STATES OF AMERICA

v.

BRIMA WURIE

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

May 4, 2009

STEARNS, D.J.

On March 27, 2008, a Grand Jury returned a three-count Indictment against Brima Wurie charging him with: (i) felony possession of a firearm and ammunition; (ii) distribution of cocaine base (crack cocaine) within 1000 feet of a school; and (iii) possession of crack cocaine with intent to distribute. Wurie was arrested on September 5, 2007, on suspicion of selling a small quantity of drugs. He was transported to the Area C-6 station in South Boston. There, his personal property was inventoried. Information gleaned from one of Wurie's cell phones led officers to his apartment. Pursuant to a warrant, police seized 215 grams of crack cocaine and a loaded firearm from Wurie's apartment.

Wurie moves to suppress the evidence seized from his person incident to his arrest and later from his apartment, arguing that "police violated his constitutional rights as guaranteed to him by the Fourth, Sixth and Fourteenth Amendments," that the "stop and seizure were conducted without probable cause, without consent, without a properly issued search warrant, and without any other legal justification . . . [and, that] the seizure of his

personal belongings and later use by the police of his phone and keys were done in violation" of these same rights.[1]  The court heard argument on the motion on January 20, 2009.  At the conclusion of the hearing, the court granted Wurie leave to file a supplemental brief, but none has been forthcoming.

BACKGROUND

As there are no disputed material facts, the court will rely on the factual recitations in the warrant affidavit and the parties' pleadings.[2]  Sergeant Detective Paul Murphy is a twenty-two year police veteran and the supervisor of the Area C-6 Drug Control Unit.  On September 5, 2007, shortly before 6:45 p.m., while patrolling in an unmarked vehicle, Murphy observed a man (later identified as Fred Wade), talking on a cell phone in the parking lot of a Lil Peach convenience store on Dorchester Avenue.  Wade was intently watching passing traffic.  A few minutes later, Murphy saw a white 2007 Nissan Altima sedan turn into the parking lot.  Wade got into the front passenger seat.  The only other occupant of the car was the driver (later identified as Wurie).  Wurie drove from the lot, turning left onto Dorchester Avenue in the direction of D Street.  Murphy followed.  Wurie

---

[1]The court will limit its discussion to Wurie's Fourth Amendment claim.  The protections of the Sixth Amendment apply to a defendant only *after* indictment.  Kirby v. Illinois, 406 U.S. 682, 688-689 (1972).  The reference to the Fourteenth Amendment is difficult to fathom.  The Fourth Amendment provides Wurie with an "explicit textual source of constitutional protection" against any unlawful police intrusion on his right of privacy.  Consequently, any Fourteenth Amendment claim is superfluous.  See Graham v. Connor, 490 U.S. 386, 395 (1989).

[2]The only relevant issue with respect to the seizure of the cocaine and firearm as will be seen is one of law, specifically, the propriety of the officers' warrantless examination of the call log of Wurie's cell phone.  But for the possible taint, the warrant affidavit fully satisfies the probable cause requirement of the Fourth Amendment.

2

drove approximately one hundred and fifty yards, made a U-turn, and returned to the Lil Peach.  Wade left the car and entered the Lil Peach.  Wurie then drove away.

Believing that he had witnessed a drug transaction,[3] Murphy broadcast the make, model, and license plate number of Wurie's car.  Accompanied by Officer Christopher Boyle, Murphy entered the Lil Peach and confronted Wade.  Two plastic bags, each containing an 8-ball (3.5 grams) of crack cocaine, were seized from Wade's left front pocket.  Wade stated that he had purchased the cocaine from "B."  He also told the officers that "B" lived in South Boston and sold crack cocaine in quantities no smaller than an 8-ball.

Officer Steven Smigliani, having heard Murphy's broadcast, spotted and followed the Altima.[4]  Murphy radioed Smigliani and told him what Wade had said.  Officer Smigliani waited for Wurie to park and exit his car.  He then arrested him for distributing cocaine. Wurie was taken to the Area C-6 police station.  Police seized two cell phones, a key ring with keys, and $1,275 in cash from Wurie's person.

Approximately 5 to 10 minutes after Wurie was brought to the station, Officers Kevin Jones and Robert England, members of the C-6 Drug Control Unit, examined one of the cell phones seized from Wurie.  They observed numerous calls logged on the caller ID screen from "my house."  When the phone rang, the officers flipped it open, activating the

---

[3]According to Murphy, a popular method of selling drugs in South Boston is by car delivery, where the parties negotiate a price for the drugs over the phone, the buyer proceeds to an agreed-upon location, the dealer arrives in a car, and the parties consummate the sale in the car.  While completing the deal, the parties often drive a short distance to avoid police surveillance.

[4]The Altima had been rented earlier by Wurie.

backlight.  They observed a "wallpaper" photo of a young black female holding a baby.

They also saw that the "my house" calls originated from "617-315-7384."  Officer Jones,

using a police computer, typed the number into the website "AnyWho" (www.anywho.com).

The number was listed to "Manny Cristal" at 315 Silver Street in Boston.  The officers did

not answer the call or access any other information stored in the phone.

After Murphy gave Wurie a second set of <u>Miranda</u> warnings,[5] Wurie stated that he

lived at 51 Speedwell Street in Dorchester and that he was in South Boston "cruising

around."  He denied stopping in the Lil Peach parking lot, denied giving anyone a ride,

denied speaking with anyone in South Boston that day, and denied selling cocaine.  Based

on the large amount of cash Wurie was carrying, his two cell phones, the rented car, the

drugs found on Wade, and Wade's description of "B's" mode of drug dealing, Murphy

suspected that Wurie was selling 8-balls (a fairly large street-level quantity of crack) out

of a hidden mother cache.[6]  Murphy also believed that Wurie was lying about living in

Dorchester and that his true address was 315 Silver Street in South Boston.

Murphy and other Drug Control Unit officers proceeded to 315 Silver Street with the

key ring seized from Wurie.  There, they found three mailboxes outside the apartment

building's front door, one of which had the names "Cristal" and "Wurie" written on it.  The

lights in the first floor apartment were on.  Through the window, Murphy saw a young black

woman talking on the phone.  She appeared to be the same woman that Jones and

---

[5]Officer Smigliani had administered <u>Miranda</u> warnings to Wurie upon his arrest.

[6]According to Murphy, a telltale characteristic of a drug dealer is the use of two cell phones – one for arranging drug deals and another for personal use, and the use of rental cars to conduct business (to avoid forfeiture of their personal vehicles if caught).

England had observed in the cell phone's wallpaper photo.  Murphy used Wurie's keys to unlock the door to the front entrance of 315 Silver Street.  In the common hallway, one door led to a first floor apartment, another to an apartment on the second floor.  Murphy tried to unlock the door to the second floor apartment, using all of the keys on Wurie's key ring, but none worked.  He then tried the keys in the first floor apartment door.  One key unlocked the door.  Without opening the door, Murphy removed the key from the lock and knocked.  A young woman (later identified as Yolanda Walker), answered the door. Murphy identified himself as a Boston Police officer and asked Walker to step into the hallway.  He could smell the distinct odor of burnt marijuana emanating from inside the apartment.  Walker told Murphy that she knew Wurie and that he occasionally stayed at the apartment.  She also admitted that he had been in the apartment the night before and earlier that day.  The officers then entered the apartment to "freeze" it while they obtained a search warrant.  Inside the apartment, the officers found a sleeping child who resembled the infant pictured on the cell phone's wallpaper.  When Murphy returned to the station to prepare the warrant affidavit, he asked Wurie why his keys opened the door to the first floor apartment of 315 Silver Street.  Wurie replied, "I don't know."

After obtaining and executing a search warrant, officers recovered from the master bedroom of the apartment 215 grams of crack cocaine, a Smith & Wesson .9 millimeter firearm loaded with five rounds of ammunition, six loose rounds of .40 caliber hollow point ammunition, four plastic bags of marijuana, photographs of Wurie and Walker and other

personal papers, drug paraphernalia, and $250 in cash.[7]

## DISCUSSION

Probable Cause to Arrest

An arrest must be supported by probable cause for a search to be lawful.  Beck v. Ohio, 379 U.S. 89, 91 (1964).  "Probable cause" is a far less exacting standard than any test implying a degree of relative certainty, or even a "more likely than not" view of the facts.  See United States v. Melvin, 596 F.2d 492, 495 (1st Cir. 1979).  "[P]robable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense."  Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992).  Probable cause may be based on credible hearsay information that would not itself be admissible at trial.  Draper v. United States, 358 U.S. 307, 311-312 (1959).  "When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed."  Beck, 379 U.S. at 96.  In making this assessment, a court will be guided by the collective knowledge or "fellow officer" rule, that is, where police are engaged in a collaborative effort, the knowledge of each officer may be "pooled" in establishing probable cause.  United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002).  Finally, a court may consider an officer's training and experience in assessing probable cause.  Conduct that

---

[7]The Bureau of Alcohol, Tobacco, Firearms and Explosives determined that the .9 millimeter firearm was stolen on April 5, 2005, during a burglary in Columbus, Georgia.

6

might be perceived as innocent by a casual onlooker may in the totality of the circumstances appear suspicious to a trained officer.  United States v. Arzivu, 534 U.S. 266, 273 (2002).

Based on his experience, his knowledge of the methods used by drug dealers, and his observations of the interaction between Ward and Wurie, Murphy reasonably believed that he had witnessed a drug transaction on September 5, 2007.  See United States v. Sokolow. 490 U.S. 1, 9 (1989).  When Ward admitted purchasing the crack cocaine found on his person from someone who could only have been Wurie, Murphy had probable cause to instruct Officer Smigliani to place Wurie under arrest.  See United States v. Harris, 403 U.S. 573, 583 (1971) (an informant's admissions of his own criminal involvement - his "declarations against penal interest" - carry their own inherent indicia of credibility).

The Seizure of Wurie's Keys and Cell Phones

"If an arrest is lawful, the arresting officers are entitled to search the individual apprehended pursuant to that arrest.  The permissible purposes of such a search include preservation of evidence . . . and seizure of destructible contraband."  United States v. Uricoechea-Casallas, 946 F.2d 162, 165 (1st Cir. 1991) (internal citations omitted).  A full search of the person, his effects, and the area within his immediate reach at the time of a lawful custodial arrest may be conducted without regard to any exigency or the seriousness of the offense, and regardless of any probability that the search will yield a weapon or evidence of the crime for which the person is arrested.  United States v. Robinson, 414 U.S. 218, 236 (1973).

7

The holding of United States v. Edwards, 415 U.S. 800, 803 (1974), that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention," is extended by Illinois v. Lafayette, 462 U.S. 640 (1983), to a booking search, although on a theory of a search incident to custody. "[I]t is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any *container* or article in his possession, in accordance with established inventory procedures." Id. at 648 (emphasis added). Thus, it is irrelevant whether the keys and cell phones were taken from Wurie by Officer Smigliani immediately upon Wurie's arrest or were seized from his person at the booking (the record is not entirely clear on this point).

The "Search" of the Cell Phone

Neither the Supreme Court nor the First Circuit has directly considered the issue of whether a search incident to arrest may include a search of a cell phone's contents, and if it does, how thorough the search might be.[8] It seems indisputable that a person has a subjective expectation of privacy in the contents of his or her cell phone. See, e.g., United States v. Finley, 477 F.3d 250, 259-260 (5th Cir. 2007) (defendant had a sufficient privacy

---

[8]The issue is whether Officers Jones and England were entitled to look at the call log on Wurie's cell phone without a warrant. No cognizable issue would be raised if the officers in fact examined Wurie's phone after it had been inventoried (again the record is not clear). The prevailing rule does not bar police from taking a "second evidentiary look" at inventoried personal property whether in connection with the crime of arrest or an unrelated crime; United States v. Johnson, 820 F.2d 1065, 1072 (9th Cir. 1987); United States v. Jenkins, 496 F.2d 57, 73-74 (2d Cir. 1974); Wayne R. LaFave, 3 Search and Seizure, § 5.3(b) (4th ed. 2004). See also United States v. Grill, 484 F.2d 990, 991 (5th Cir. 1973) (key found on arrestee's person and placed with inventoried property later retrieved and used to open the lock on a duffle bag; reasonable grounds to believe that the key would connect the defendant with the incriminating bag).

interest in his cell phone's call records and text messages to challenge their search; the search of the stored text messages, however, was permissible as incident to a valid arrest). Decisions of district courts and Courts of Appeals (often analogizing cell phones to the earlier pager technology) trend heavily in favor of finding that the search incident to arrest or exigent circumstances exceptions apply to searches of the contents of cell phones. See United States v. Mercado-Nava, 486 F. Supp. 2d 1271, 1277 (D. Kan. 2007) (the same exceptions apply to warrantless searches of cell phones under the Electronic Communications Privacy Act as any other warrantless search.); United States v. Deans, 549 F. Supp. 2d 1085, 1094 (D. Minn. 2008) (agreeing with the Fifth Circuit that, "if a cell phone is lawfully seized, officers may also search any data electronically stored in the device."); United States v. Valdez, 2008 WL 360548, at *3 (E.D. Wis. Feb. 8, 2008) (search of defendant's phone was contemporaneous with his arrest and the officer was reasonably concerned that if he delayed, the information on the phone would be lost); United States v. Lottie, 2008 WL 150046, at *3 (N.D. Ind. Jan. 14, 2008) (warrantless search of a cell phone justified by exigent circumstances); United States v. Dennis, 2007 WL 3400500, at *7 (E.D. Ky. Nov. 13, 2007) (search of a cell phone incident to valid arrest no different from the search of any other type of evidence seized incident to arrest); United States v. Parada, 289 F. Supp. 2d 1291, 1304 (D. Kan. 2003) (phone seized incident to valid arrest; exigent circumstances justified accessing cell phone's call records because continuing incoming calls would overwrite memory and destroy evidence); Cf. United States v. Morales-Ortiz, 376 F. Supp. 2d 1131 (D.N.M. 2004) (otherwise unlawful search of cell phone's memory for names and numbers was justified under the inevitable

discovery doctrine); <u>United States v. James</u>, 2008 WL 1925032 (E.D. Mo. April 29, 2008) ("[T]he automobile exception allows the search of the cell phone just as it allows a search of other closed containers found in vehicles.").[9]  <u>See also</u> <u>United States v. Reyes</u>, 922 F. Supp. 818, 834 (S.D.N.Y. 1996) (warrantless searches of the stored memory of two pagers justified (i) as incident to arrest and (ii) by general consent);   <u>United States v. Chan</u>, 830 F. Supp. 531, 535-536 (N.D. Cal. 1993) (warrantless search of pager memory comparable to a search of container contents; search was not so remote in time to invalidate it as a search incident to arrest); <u>United States v. Diaz-Lizaraza</u>, 981 F.2d 1216, 1223 (11th Cir. 1993) (agents reasonably activated defendant's pager to confirm its number).  <u>Cf.</u> <u>United States v. Thomas</u>, 114 F.3d 403, 404 n.2 (3d Cir. 1997) (noting in dicta that the retrieval of a phone number from a pager found on defendant was a valid search incident to arrest).

The search of Wurie's cell phone incident to his arrest was limited and reasonable. The officers, having seen the "my house" notation on Wurie's caller identification screen, reasonably believed that the stored phone number would lead them to the location of

---

[9]<u>But</u> <u>see</u>  <u>United States v. Wall</u>, 2008 WL 5381412, at *3-4 (S.D. Fla. Dec. 22, 2008) (declining to follow <u>Finley</u>; exigent circumstances might justify a warrantless search of a cell phone; but declining to allow a search of arrestee's cell phone incident to arrest; likening information stored in cell phone to a sealed letter);  <u>United States v. Quintana</u>, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. Jan 20, 2009) (officers may be justified in searching the contents of a cell phone for evidence related to the crime of arrest, but "[w]hether a cell phone may be searched incident to an arrest to prevent the destruction or concealment of evidence of another crime is a different issue.");  <u>United States v. Park</u>, 2007 WL 1521573, at *9 (N.D. Cal. May 23, 2007) (based on "the quantity and quality of information that can be stored" a cell phone "should not be characterized as an element of an individual's clothing or person [subject to search incident to arrest], but rather as a 'possession within an arrestee's immediate control that has fourth amendment protection at the station house.'").

Wurie's suspected drug stash.  See United States v. Sheehan, 583 F.2d 30, 32 (1st Cir. 1978) (copying the names and telephone numbers from a list found in arrestee's wallet was proper under United States v. Edwards, as "it would seem to be equally respectable police work to assume that checking out known associates of a suspect in a bank robbery committed by several people might yield helpful information.").  Id.  I see no principled basis for distinguishing a warrantless search of a cell phone from the search of other types of personal containers found on a defendant's person that fall within the Edwards-Lafayette exceptions to the Fourth Amendment's reasonableness requirements.  See e.g. United States v. Rodriguez, 995 F.2d 776, 778 (7th Cir. 1993) (contents of an address book in arrestee's wallet); United States v. Rust, 650 F.2d 927, 928 (8th Cir. 1981) (per curiam) (arrestee's pockets); United States v. Garcia, 605 F.2d 349, 355 (7th Cir. 1979) (hand-held luggage); United States v. Castro, 596 F.2d 674, 677 (5th Cir. 1979) (man's wallet); United States v. Moreno, 569 F.2d 1049, 1052 (9th Cir. 1978) (woman's purse).

Briefly addressing the remaining issues, I see nothing unlawful in the use of Wurie's key to enter the common hallway of the apartment building at 315 Silver Street;[10] the insertion of Wurie's key in the lock of the apartment door to determine whether it fit,[11] or

---

[10]See United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998) ("It is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building.").

[11]See United States v. DeBardeleben, 740 F.2d 440, 445 (6th Cir. 1984) (insertion of keys in automobile locks to determine ownership did not infringe any significant Fourth Amendment interest); United States v. $109,179 in U.S. Currency, 228 F.3d 1080, 1087-1088 (9th Cir. 2000) (same); United States v. Lyons, 898 F.2d 210, 212-213 (1st Cir. 1990) (same, padlock on storage locker); Commonwealth v. Alvarez, 422 Mass. 198, 209-210

the "freezing" of the apartment to maintain the status quo while police obtained a warrant.[12]

ORDER

For the foregoing reasons, Wurie's motion to suppress is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

_____

(1996) (exterior door lock of an apartment ); <u>Commonwealth v. DeJesus</u>, 439 Mass. 616, 627 n.10 (2003) (same); <u>State v. Church</u>, 430 S.E.2d 462, 466 (N.C. App. 1993) (garage door).

[12]Having smelled the odor of burnt marijuana, the officers had probable cause to believe that drugs were present.  "The case law is consentient that when a law enforcement officer detects the odor of marijuana emanating from a confined area . . . that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area."  <u>United States v. Staula</u>, 80 F.3d 596, 602 (1st Cir. 1996).  It was also reasonable for their safety to enter and secure the apartment while they (commendably) waited for a warrant to arrive.  "Securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of the dwelling or its contents."  <u>Commonwealth v. Blake</u>, 413 Mass. 823, 829 (1992) (citing <u>Segura v. United States</u>, 468 U.S. 796, 810 (1984)).  <u>See</u> also <u>Illinois v. McArthur</u>, 531 U.S. 326, 333-334 (2001).  I do not, on the other hand, agree with the government that the entry of the apartment can be justified as a "protective sweep."  <u>See</u> <u>United States v. Martins</u>, 413 F.3d 139, 149 (1st Cir. 2005). "The baseline rule is that police officers, in conjunction with an arrest on residential premises, may undertake a protective sweep so long as they can point to 'articulable facts which, taken together with the rational inferences from those facts,' would warrant a reasonably prudent officer in believing 'that the area harbor[s] an individual posing a danger.'"  <u>Id.</u> (quoting <u>Maryland v. Buie</u>, 494 U.S. 325, 327 (1990) (emphasis added)). "[T]he key is the reasonableness of the belief that the officers' safety or the safety of others may be at risk."  <u>Martins</u>, 413 F.3d at 150.  A protective search "may extend only to a cursory inspection of those spaces where a person may be found," and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."  <u>Id.</u>, at 335-336.  The officers had no reasonable basis to believe that Walker or her infant child posed any danger to the officers' safety (as opposed to the possible destruction of  evidence).